Our next case up is 4-12-10-07, First National Bank v. Miles et al. For the appellant is David Dury. You are he, sir? Is that pronounced correctly, sir? Yes. And for the appellee is Joseph Wetzel. You are he? Okay. Mr. Dury, you may proceed. May it please the court, in January and February of 2006, Harold Miles was paid up on his loan to Fisher Bank. At that time the balance was about $2 million and had been reduced from $2,700,000. The loan was secured by the remaining 89 lots in the Pheasant Ridge subdivision in Rantoul. Eleven lots had been sold and used to reduce the loan balance from $2,700,000 to $2,000,000. But at that time the loan required Harold to pay interest but not principal. He was to pay principal as the lots were sold. So he was paid up but he owed the 2004 real estate taxes of $149,267.03. He owed $105,000 to the IRS and he owed a $40,000 judgment to Longview Farms. He had three sales contracts for $90,000, $75,000, $900,000 and $85,000 which totaled $250,900. At the time the fair market value of the remaining 89 lots was $4,500,000. In January when Harold approached his attorney Jeffrey Wampler to sell those three lots, Mr. Wampler found out about the IRS lien and the real estate taxes and contacted Fisher Bank. And Fisher Bank agreed in a letter, this is at the appendix A45, stating that it was the bank's desire to liquidate the properties as quickly as possible. It was to the bank's benefit and for that purpose it would allow the IRS to take $1,500 from the sale of each lot as they were sold if the IRS would release its lien on a lot by lot basis. Jeffrey Wampler immediately sent that letter of the bank to, and that letter was written by Michael Estes, the president of the bank. Jeffrey Wampler immediately sent that letter to the IRS, that's at appendix A48. Then on February 3 there was a meeting. Jeff Wampler was there and Harold Miles, who is here, was there, and Eric Stalter, who is here on behalf of the bank, was there. And they had a meeting about how to get the lots sold, resolve the issues with the IRS, and get the loan paid down. And on that day the bank agreed to redeem the delinquent real estate taxes if the IRS would release its lien on the lots on a lot by lot basis. That agreement was then documented in a letter issued by Jeffrey Wampler as the attorney for Harold Miles, that's at A35 in the appendix. And in that letter he stated that Fisher Bank will redeem, the letter by the way was to the IRS, and it said Fisher Bank will redeem the delinquent real estate taxes. The purpose of the letter is to request certificates of discharge to allow Mr. Miles to sell his three lots and the remaining properties. On the second page of the letter he said, Also enclosed is the February 9, 2006 letter from Fisher National Bank confirming that they are going to redeem the delinquent real estate taxes. And that was signed by Jeffrey Wampler, and he sent a copy to Mr. Estes of Fisher Bank and Eric Stalter of Fisher Bank. He attached to that letter the February 9, 2006 letter from Eric Stalter in which Eric Stalter said that this time the bank was willing to let the IRS have $1,000 per lot, not $1,500 as Mr. Estes had said on January 30th. And Mr. Stalter said, quote, This change is due to the bank redeeming the delinquent real estate taxes and improving the position of all who have been secondary to the bank. I don't know if you can help me with the terminology. Redeemed delinquent real estate taxes seems like an odd term to me. What is redemption? Pay them off. Redeeming taxes then is not paying them off after there's been a tax sale, a tax purchaser? Just pay them off. Take care of the lien. And if I may, Your Honor, to move forward, a copy of Mr. Wampler's February 10 letter and attached February 9 letter from Mr. Stalter was also sent to the bank, to Eric Stalter. And Eric Stalter then wrote on his copy of that letter, a handwritten note, I'm not sure I understand the terminology. So these taxes were not sold at a tax sale? I do not recall from the record whether they had to be redeemed from somebody who bought them at a tax sale or whether they just had to be paid. I do not recall that. But either way, they could be redeemed. There's no dispute about the fact that if they were. So you don't think redemption is a term of art that refers only to taxes sold at a tax sale? You think redeemed just means buy them? Buy them back? Pay them off? Whatever is required. They were within any period of redemption if they had been sold at a tax sale. Okay. So merely somebody had to come up with $149,267.03, and that resolved the real estate taxes for 2004, the real estate taxes for 2005 were not yet due. And between February 3 and March 21, 2006, Harold sold 10 more lots at $60,000 a lot, and those contracts were submitted to the IRS and copies of those contracts were sent to the bank as well. So in addition to the first three lots that he had contracts for, he had 10 more for a total of 13. The IRS on April 5 issued a certificate or agreed to issue a certificate of discharge for two of the lots. The reason they didn't issue it for three of the lots is the grays, one of the initial purchasers, had dropped out. But Marjorie O'Brien and the Harshbargers were still in, and the IRS issued a letter saying, we agree to issue certificates of discharge for these two lots. All 13 contracts were approved at the intermediate level of the IRS by Joseph Monsoor, including the 10 additional ones, and at the higher level of the IRS they said, we'll do the first two that we've approved and then we'll process the others. As it turns out, with the 10 additional contracts, Harold had enough proceeds to pay off the IRS lien completely. He didn't actually need a lot-by-lot release. He could pay off the $105,000 completely, pay off the real estate taxes for 2004, pay off the real estate taxes for 2005, which were not yet due, pay off the $40,000 judgment to Longview, and have money left over to pay down the principal balance. And he had 78 lots left after that to sell, with the appraised value being $4.5 million on a loan that was $2 million. After the IRS approved two lots, said, okay, we'll agree to the $1,000 per lot, we'll release the IRS lien. Once you do that, come back and we'll talk about the other 10 contracts. The Harshbargers dropped out. So the IRS said, okay, you can substitute one of the other contracts for the Harshbargers. So you still have two approved contracts. At the time, the bank was holding an escrow account for Harold of about $49,000. So the sale of two lots and the $49,000, after paying the IRS $1,000 per lot, still more than paid off the real estate taxes for 2004. Jeffrey Wampler's office, his assistant, and Jeffrey Wampler himself both contacted Eric Salter at the bank and said, we have these certificates from the IRS for two lots. We have Marjorie O'Brien who wants to go forward. We want to close on it. And the bank said no and refused to go forward. A year later, actually later in the year, the bank filed for foreclosure on Pheasant Ridge. The only breaches alleged in the foreclosure lawsuit were the real estate taxes for 2004 and 2005, which had now become due. No other breaches were claimed. In fact, in May of 2007, Harold was still paid up on his interest payments, the only thing he had to pay on the principal amount of the loan. The first issue is whether or not the court correctly construed the agreement represented by the two lots. The agreement, the two letters, states in three different places, the bank will redeem the 2004 or the delinquent real estate taxes. And only 2004 was delinquent. It says that at the bottom of page A35 of the appendix, paragraph number one, quote, Fisher National Bank will redeem the delinquent real estate taxes. The second page of that letter also encloses the February 9, 2006 letter from Fisher National Bank confirming that they are going to redeem the delinquent real estate taxes. And then Eric Stalter, in his February 9 letter, said, quote, this change, and this change being the IRS would get $1,000 a lot instead of $1,500 a lot. This change is due to the bank redeeming the delinquent real estate taxes and improving the position of all who have a secondary lien. So the first issue is whether the trial court correctly determined that it needed to resort to parole evidence to determine whether the bank did or did not agree to redeem the real estate taxes. By April of 2006, all possible conditions that it might have argued against had been met. Harold had 11 viable contracts, two certificates from the IRS. He didn't need a lot-by-lot approval by the IRS on the remaining contracts, but he had the intermediate approval and the IRS was just waiting until the first two went through before they approved the other 10. The IRS had no reason not to proceed, but he didn't need it. He could pay off the IRS lien completely. And the bank said no. The court concluded from the testimony of Jeffrey Wampler that what the bank really agreed to do was cause the redemption of the real estate taxes. That's the second point in our brief, and the point that we're making here is even if this court accepts the trial court's construction as what the bank really agreed to do is cause the redemption of the real estate taxes, they didn't do that either. There was more than enough money there to pay off everything and contracts to do it. And the property was worth twice the amount of the remaining balance on the loan. So even if the court accepts the trial court's interpretation of the agreement, the bank reached that. The bank itself filed a pleading and offered from its examination of Jeffrey Wampler, testimony from Jeffrey Wampler, that, quote, if... Well, I shouldn't say quote. I'm putting this on my notes. I shouldn't do that. Paraphrasing on pages 35 and 36 of our brief where we do quote from the language that if Harold could sell enough lots to satisfy Longview Farms and the IRS, he could use the sales proceeds to pay the delinquent real estate taxes. That's the bank's version of the agreement. They breached that version of the agreement too. There was enough contracts to pay everybody, and the bank said they wouldn't proceed. Restating, the approval of the IRS arguably was no longer needed on a lot-by-lot basis. The land could simply be paid in full, $105,000 to the IRS. The next issue that we've raised is... And those issues that I've just addressed are de novo review, the court's construction of the contract, the law applicable to the contract. Wasn't the letter merely, Blomquist's letter, merely a memorization of the agreement? It's not the agreement, is it? Well, I'm not quite sure of the distinction between a memorialization of the agreement and the agreement itself. Well, if you and I reach an agreement and I write a letter to a third party talking about what the agreement is, that's my description of the agreement. It's not the agreement. If we have a written agreement, for instance, that would be the contract. Or if we have an oral contract, it would be the oral contract between you and me, not my letter description of what I believed it to be. Isn't that correct? Well, Justice Stegman, what I would submit is if you prepare a memorandum of your agreement, that you believe what the agreement is, and you sign it, and the other side signs it too, I would say that you've reached an agreement. Is that what happened with Wampler's letter? Yes, I'll walk through it. In Wampler, first of all, we have the initial letter from the bank president back in January. And he merely said, he didn't say anything about redeeming the taxes, but he said, we're willing to let the IRS have $1,500 per lot because it's to our advantage to move this thing forward and liquidate. Then on February 9, the bank says, Eric Stelter says, that it's $1,000, not $1,500, and this change is due to the bank redeeming the delinquent real estate taxes. On the following day, and that's signed by the bank, on the following day, Eric Stelter writes the IRS and attaches the letter from Eric Stelter of the previous day, and says Fisher National Bank will redeem the delinquent real estate taxes. And then in the next page, he says, also enclosed is a February 9 letter from Fisher National Bank confirming they're going to redeem the real estate taxes, and a copy of that was sent to Eric Stelter and Michael Estes. And then Eric Stelter writes on his copy of it the amount needed to redeem the real estate taxes. I would submit to the court, that's more than a memorandum of the agreement, that's an agreement signed by both sides. Well, the only agreement, written agreement, was the original mortgage, wasn't it? Well, I would submit the three letters, or the three letters plus the additional copy with the handwritten statement of the amount. Are you saying those letters amended the mortgage? Yes. Absolutely. Was that the argument you made to the trial judge? Well, we argued there was an agreement they would redeem the real estate taxes, and whether you'd call that an amendment or not. Well, Wampler and Stelter testified, didn't they, that they were mistaken? In fact, thinking about this, the letters were badly written and weren't accurate representations? I don't think Stelter did. Jeffrey Wampler testified that he was mistaken, his letter was inaccurate and mistaken, and I can get to that issue. But yes, I would submit that this is a binding agreement that they'll redeem the real estate taxes, whether it be a modification of the mortgage, which I would submit that it is. They've agreed that it's to the advantage of both sides for the bank to do that. Well, when you talk about the noble review, didn't the trial judge say, I believe Wampler's testimony? He did, and I'm prepared to address that. Well, if we're talking about credibility questions, that's not the noble review. No.  Well, you've got two minutes to do it, counsel. Is this, I've got five? Two. Plus five left at the end? Yes. Five in rebuttal. I'll go fast. Go ahead. The credibility issue, it's whether it's against the manifest weight of the evidence, which is whether the opposite conclusion is clearly evidenced or it's arbitrary and unreasonable for the judge to decide the way he did. And when you look, all Harold Miles testified to is consistent with the written agreement, the written letters. Jeffrey Wampler, and the judge was impressed that Jeffrey Wampler testified, well, he realized his letter was inaccurate while he was still representing Harold in the underlying mortgage foreclosure case, the one filed in 2006. But Jeffrey Wampler gave three different versions of when he first realized his letter was inaccurate. The first version was he said it was August 2010 when a malpractice case was filed against him. Then he testified the second time, well, it was August 2008 when I first entered my appearance for Harold Miles in the underlying mortgage foreclosure case. And then finally the third time he testified it was in February 2007 while his partner, Rick Eltz, was preparing the response to the mortgage case. So he gave three different versions of it. Then no one said that Eric Spalter's letter was inaccurate. It's a separate letter. It says the same thing, that the bank will redeem the real estate taxes. Jeffrey Wampler's testimony conflicts with the language of both letters, reaffirmed a couple of times. And if Jeffrey Wampler's testimony is accepted, he and Rick Eltz have a clear conflict of interest. If he realized in February 2007 before a responsive pleading was filed in the underlying foreclosure case, the original foreclosure case on President Ridge, that he believed the letter was inaccurate and his testimony on it would be conflicted with Harold's interest, he couldn't continue to represent Harold in the mortgage foreclosure case and fail to raise that as a defense, which is exactly what he did. So in terminating his credibility, those factors have to be considered. Plus, and I'll use part of my rebuttal time. Now that you know, Counsel, I'm sorry, your time is up. You'll have an opportunity to address this again in rebuttal. Thank you, Your Honor. Okay, Mr. Wetzel. Counsel? Counsel? This case is about the trial court upon hearing the testimony of the parties and of the witnesses and whether the trial court correctly resolved conflicting testimony regarding an oral agreement reached on February 3rd, 2006. In doing so, the trial court... Well, Counsel, as argued, in addition to the oral agreement, there were two letters, one from the vice president and one from the attorney, correct? Correct. We're talking about millions of dollars here. The vice president admits that his letter is poorly worded and the attorney also admits that his letter was poorly worded. How does that happen when we're talking about millions of dollars? They both use the term, the bank will redeem. Should taxes. Sure, Justice Turner. The reason for the letters was not specifically to memorialize the oral agreement reached. The purpose and the aim of the letters, as Jeffrey Wampler testified, was I'm trying to get the IRS on board. I'm trying to get the IRS to play ball with us so that... I know that's what he testified, but why, that's clear. Why would you write in the letter, the bank will redeem the taxes then? Because that's not saying the same thing, is it? No, that's not saying the same thing. And why would the vice president of the bank say the bank will redeem the taxes? That's not saying the same thing either, is it? That's not saying the same thing as the oral agreement that was reached, correct. Okay, my question is how does the vice president of the bank and the attorney, when we're talking about millions of dollars, happen to use the same language that the bank is going to redeem the taxes and then explain it away by saying they're poorly worded letters? I'm not sure if there was testimony on this fact, but I think there may have been some deposition testimony from Jeff Wampler because what he said is I quoted the bank's letter. I just picked up that word redeemed and I used that in my letter. Okay, what does the term redeemed mean to you? I ask opposing counsel that. Sure. And maybe it doesn't make any difference, but I'm not so sure and that's why I ask you to indulge me by responding. Sure. I don't know exactly what that term meant at the time it was written. I don't believe there was any testimony, even in discovery as to that fact, as to that issue. I do know what is clear. The bank said, look, the term redeemed does not mean we're going to voluntarily go out and pay whatever is due on the real estate taxes. That's why I wish someone could answer my question, what precisely does it mean? So Wampler just had a bad hair day? Is that what you're talking about? Gee, I just screwed up? He said that it was not, I mean, his testimony wasn't intended to be an accurate representation of the actual agreement that was reached on February 3rd. Was it worded that way in order to get the IRS to get on board? Vis-a-vis the IRS, the IRS and Fisher National Bank, or Miles, I guess, because of Miles' tax debt, vis-a-vis Fisher, Miles and the IRS, it was immaterial to the IRS who was going to pay the real estate taxes. So I don't think the choice of words was that important in that particular context. And I guess that is really the point that the trial court found, is we have to look at these two letters in the context in which they were written. Considering the testimony of the parties, considering all of these other credibility factors, that we would typically consider. But wouldn't we also have to consider, or shouldn't the trial court also have to consider, whether the use of that terminology misled Mr. Miles? Well, the use of that terminology, I don't know if Mr. Miles necessarily relied on that term, because he was, one, at the meeting, and he knew what the agreement was, and two, I'm not sure that, I just don't think he was misled into believing that a course of action was occurring, that, I mean, he testified the bank agreed to redeem the taxes, the bank agreed to pay the taxes. So I'm not sure if he could have been misled by that word. Wapler testified at trial? Yes, he did. And Mr. Miles did as well? Yes, he did. And the trial court found Wapler the more credible witness? The trial court actually found two attorneys testified at trial, Jeff Wampler and Rick Isles, both of whom were Mr. Miles' former counsel. The trial court found that the testimony of Jeff Wampler and Rick Isles was more credible than Harold Miles' testimony. Now, we're supposed to be deferential to the trial court, especially with regard to findings of credibility. That might be the single thing we're supposed to be most deferential to. You heard Mr. Duray's argument here. How did the trial court reach the conclusion it did with regard to credibility issues here? Well, I guess the first question, let me answer the question, Justice Steigman, in this manner, by saying at the end of Appellant's oral argument today, he actually gave us, he said exactly why. There are three versions. Jeff Wampler testified as to three different versions of the agreement. While I may dispute that characterization of the testimony, even if you look at it that way, the trial court's inherent finding of which version as to which to believe is purely something within trial court's discretion. And moreover, in this particular instance, Judge Jones recalled independent, the parties both called Jeff Wampler to testify at trial, independent of the parties. The trial judge, Judge Jones, recalled Mr. Wampler on two separate occasions to question him about these facts, to really get to the kernel of truth, what was going on. Are you really telling me the truth now, or are you telling me? Wait a second, I'm not sure I understand. Wampler testified, and Miles testified, and the judge, Sue Esponte, asked for Wampler to come back and testify some more? Twice. Yes. To really get to the kernel of truth, and in the trial judge's ruling, he explained, he said, the reason I did that is I want to get to, were you telling me the truth? Were you telling me the truth because your version of what you're telling me on the witness stand now changed after you got sued for malpractice, yes or no? And the second time, after he recalled Jeff Wampler the second time, he then recalled Rick Iles, the other attorney who testified in the case, Sue Esponte as well, and said, okay, here's what Jeff Wampler has told me. I need something, what is there to back up what he's telling me? And the trial judge, after questioning Sue Esponte, Rick Iles, the trial judge made his determination that the credibility, the stories I heard from Harold Miles' counsel, the former counsel at the time, combined with the other evidence in the case, whether that be the testimony of Eric Stalter from the bank or the other documentary evidence that came in at trial, was more believable. That story, that version of events that transpired was more believable than the story that I was, than the testimony and the story that I heard from Harold Miles. What were the inconsistencies, if any, in Miles' testimony that the court noted? Sure, the inconsistencies, do you mean vis-a-vis other testimonies? Well, I'm just wondering, you know, just did the court explain why, what the problems were that he found in Miles' testimony? He did, I mean, the trial judge said that, you know, he would have the opportunity to observe Mr. Miles testify. I personally cross-examined him, I mean, impeached him on a few minor items, but, I mean, those are all issues that he took into account. His testimony was inconsistent with Wampler's? His testimony was inconsistent with Wampler's, yes it was. And I guess to resolve that conflict in testimony, that's something that Judge Jones sided one way with Wampler's testimony, and Rick Isles, and Eric Stalter, in making that point. But you heard Mr. DeRay claim that this is de novo review, what about that? Sure, with respect to contract interpretation, yes. With respect to whether ambiguity exists in the written agreement, if you agree with Harold Miles' position, yeah, it is de novo review. With respect to credibility findings, or with respect to conflict in testimony, those issues, those are manifest way. Did Mr. Miles have $149,000 sitting around to redeem the taxes? Great question. The facts are as follows. From Harold Miles first learned of past-due real estate taxes in September of 2005. He first learned that the taxes were not paid. For the nine months previous to that, January of 2005 to September of 2005, he was collecting rental income from the property. These are housing units that Mr. Miles rented out. He had, I believe, if I recall correctly, $369,000 in rental income in that nine months, before he realized that real estate taxes were past due. Over the course of the next two years, he collected $1.4 million in rental income. So, to answer your question, yeah, I mean, I think the money was there. Whether or not he used it, I mean, that was his prerogative not to pay the taxes. Independent of the testimony of the parties, and kind of moving away for a little bit from the testimony aspect, in this particular case, you have what you don't often have, which is the actions of the parties support the trial court's finding. In this particular case, Harold Miles testified over the course of the year following the meeting in 2006. He met with the bank on 23 separate occasions, and I never once mentioned to the bank, You guys didn't pay the taxes. Never once. Was he asked about that? At that question? At trial? Yes, he was. By you? Yep. What did he say? He said, never mentioned it. You asked him why? Let me back up, Justice Steinman. He actually said, I left that to my attorneys, but I eventually did get out of them upon further pressing. Yeah, I never mentioned it once to the bank. Well, did the bank ever mention to him, hey, Miles, you haven't paid these taxes yet? I think that, I don't know. I mean, that wasn't, there was no testimony to that effect, Justice Turner. Well, wouldn't the bank keep track of whether the real estate taxes were being promptly paid, so it wouldn't get a lien on the property? Yeah, I mean, the bank was, but they were, it was Harold Miles' responsibility under the loan documents to pay the real estate taxes. If the taxes aren't being paid, doesn't the county send notice to everybody with an interest? I, yeah, I'm sure they do. So that would be, I'm just thinking, wouldn't that be Mr. Miles and the bank? Yeah. They brought the recorded interest here? Yep. And no one did anything? No, I mean, apparently not. I mean, the bank's position was, look, it's your obligation under the loan documents to pay the taxes. We're not going to advance, because we have to debate from the bank's position, it has to advance funds. It has to advance more money on an already $2.5 million loan. Well, but following up on Justice Sterner's question, my point is, aside from who's actually paying, where's the conversation about it? Notice comes out, hey, you know, we got, what was the deficiency? A hundred and some thousand bucks? That was originally the purpose of the February 3rd meeting, is to figure out how to get these things paid. I mean, that was kind of the genesis of trying to figure this out. You said there were 23 meetings, and taxes apparently were never mentioned by either party. I don't know about by either party, but I do know from Harold Miles' perspective that he never mentioned, say, hey, you guys didn't pay the taxes. A trial court comment on that? Did not, no. Okay, go ahead. It's hard counsel for me to fathom how the situation got to the point that it did, especially since they had a meeting about the IRS and about the taxes, and there was just no follow-up. No, I mean, Justice Sterner, I don't know, because that was also one of the things, here's the other thing too, that was one of the things that Jeff Wampler said, you know, as the attorney for Harold Miles, if the bank had really said, in our original meeting, if the bank had really said, look, I'm going to pay the real estate taxes. I'm just going to go drop a check for $149,000. His comment was, wouldn't you think that I would have been out at the bank knocking at the door every day? Because the agreement was, look, there's got to be enough pieces of real estate sold all at the same time where we can set aside proceeds from closing and set that aside. And as to how it got to where it was, I mean, ultimately, you can look to IRS. The IRS said, hey, look, we'll issue certificates of discharge to release some liens, but we're only going to issue two. By the time they sent two, there was only one contract. Just out of curiosity, this 200 plus acres, whatever it was, was purchased from the government, wasn't it? Yes, it was. Well, how is it that they had a lien on it then? If the government owned it, and they sold it, and the IRS still has a lien on it, how does that happen? Sure, and I think it was actually Chenute Air Force Base. It was the U.S. government that owned it. These are the county real estate taxes. And I think, I don't recall exactly when the U.S. government sold it, but I think it was 96, 97 timeframe. So it was many years before. And then this lien relates to the 2004 real estate taxes payable in 2005. So it was a few years after the property was purchased. You're asking about the IRS? Yeah. The IRS lien was for employment taxes that Harold Miles hadn't paid. Oh. So the IRS issued a, recorded a lien because Harold Miles hadn't paid the employment taxes. Okay, that explains it. It was just odd to me that the government would sell it, but the IRS in some way would still retain a lien. I don't know why they wouldn't take care of that all at once, but there are all kinds of revelations about the IRS we find these days. It seems that way. There is another conflict in testimony that the trial court also resolved. And that conflict in testimony was what Harold Miles, this again goes back to the actions of the parties after the fact. Over the course, once Harold Miles was sued in foreclosure court, not this particular case, but the prior case in 2006, he retained Rick Isles, an attorney at Irwin-Martincus to represent him. Rick Isles testified, look, I sat down just as I do with any client, sat down across from my client and walked through the complaint and said, hey, look, this is the suit that's being alleged against you. The default is specifically you didn't pay the taxes. Can you give me anything that I can throw back at the bank that I can defend this case with? And he said, Harold Miles said, no, in fact, yeah, I didn't pay the taxes. So admitted to his own attorney he didn't pay the taxes. And Harold Miles, on the other hand, says, wait a minute, no, I told my attorney the bank reneged on its deal. So that conflict in testimony right there, again, the trial court resolved that conflict in testimony in favor. It said, I believe, Rick Isles over Harold Miles. And flowing therefrom was the trial court's finding and resulting in actions that speak louder than words. Counsel, this case has been before this court before. Weren't these issues addressed in the prior litigation that was before this court and addressed in the prior Rule 23 order of this court? That answer is somewhat, kind of, sort of. That's the way I read it. That's the way the last time I was here, Your Honors, actually, the issue was whether or not they could raise this defense at the time. To vacate the judgment and raise this fact pattern at the time. And that was the procedural posture of the case was a bit different than where we are in this case. If nothing else, Your Honors, the question that you all presented of whether or not this is an ambiguous contract, if you subscribe to Harold Miles' argument that the letters are the contract themselves, that contract is ambiguous, and the trial court properly considered testimony of the parties in the extra, testimony of the parties in the other evidence in determining that, to obtain a clear picture of what was intended. Okay. Thank you. Thank you, Counsel.  Yes, Your Honor. The judge's decision on credibility was that he concluded that Harold did not tell Rick Eltz, who was Jeffrey Wampler's partner and Rick Eltz was handling the defense of the mortgage foreclosure case, the first mortgage foreclosure case, didn't tell him that he had a defense based on these letters. While Harold disputed that, the judge decided that was the deciding issue on credibility. During the opening part of the argument, I was starting to go through some of the things as to why the judge's decision on credibility would be against the manifest weight of the evidence. I did not mean to suggest to the court that that issue was a de novo issue. The testimony from Rick Eltz and Jeffrey Wampler was that Jeffrey Wampler turns the defense of the case over to Rick Eltz. Rick Eltz finds a copy of the bank's February 9 letter in the file, and he asks Jeffrey Wampler about it. And he said Jeffrey Wampler didn't tell him that there was anything inconsistent with that letter. But Jeffrey Wampler didn't tell him about Jeffrey Wampler's letter of February 10. And Rick Eltz never saw that letter. He never discussed either letter with Harold Miles. The handling of the case, if Jeffrey Wampler really believed at that time that his letter inaccurately stated the agreement and his testimony on what the agreement really was would conflict with Harold Miles' position, there's no way that they could continue to represent Harold Miles in that case. The prior appeal was that in August of 2008 I started to represent Harold Miles in the mortgage foreclosure case for Pheasant Ridge. And I tried to raise these defenses. And the court ruled that my motion to do that was a motion for reconsideration, and that since Harold Miles and his attorneys knew all these matters before the judgment of foreclosure was entered, that they couldn't raise it. And this court affirmed just as Pope wrote the decision. So these issues, in fact, there's something in that Rule 23 opinion that's quoted in my brief that said, well, if Miles had brought these issues to the attention of the trial court before the judgment of foreclosure, that the court could have held an evidentiary hearing and thrashed out these issues. So they were never decided on the merits. With respect to the credibility, one of the reasons that I would submit that it's against the manifest weight of the evidence is that the testimony of Jeffrey Wampler and Rick Eltz occurred while Harold Miles' lawsuit for malpractice against him was pending, and it is still pending. The judge asked Jeffrey Wampler about this on three separate occasions. He asked him about it twice, and Jeffrey Wampler testified about it three times, about when he first concluded his letter was inaccurate. The original time was on the judge recalled him. Nobody asked Jeffrey Wampler, neither lawyer said, when did you decide it was inaccurate? The judge called him. This is on page 18 of my brief, by the way. It just goes through this. And he said, when did he become aware that the letter was inaccurate and incomplete? And he testified, when Harold sued him for malpractice. That's August 2010. Then I cross-examined him, and he said, no, it was really when I first started to represent Harold in the foreclosure case, August of 2008. Then the judge asked him some more questions. He said, actually, it was before Rick Eltz prepared the response to the mortgage foreclosure case, which was February 2007. And then the judge concluded, well, since Jeffrey Wampler decided that his letter was inaccurate and incomplete before the malpractice lawsuit was filed, and while he was still representing Harold, then that could be considered to be accurate testimony. But Jeffrey Wampler and Rick Eltz was giving this testimony in October of 2012, while the malpractice lawsuit was pending. In any event, Jeffrey Wampler, in a short period of time, gave three different versions, covering a span of three years, three and a half years, as to when he first realized his letter was inaccurate and incomplete. Thank you, Counselor. Your time is up. We'll take a small amount of advisement. We'll be in recess in a few moments.